| UNITED STATES DISTRICT COURT | NOT FOR PUBLICATION |
| --- | --- |
| EASTERN DISTRICT OF NEW YORK | |

ASSUNTA FUSCO MINTZ, HAIR ON
WHEELS NOW, LLC d/b/a TEPORGANICS,

                     Plaintiff,

– against –

MARKETING COHORTS, LLC, STEPHANIE
LEWIS, NICOLE LEWIS a/k/a ASHLEY
NICOLE LEWIS a/k/a ASHLEY NICOLE
MITCHELL

                     Defendants.

**MEMORANDUM & ORDER**

18-CV-4159 (ERK) (SIL)

KORMAN, *J.*:

      In March 2018, plaintiff Assunta Fusco Mintz, proprietor of Hair on Wheels Now and TepOrganics, contracted with defendant Marketing Cohorts, LLC, to redesign and upgrade her business's website. Am. Compl. ¶¶ 1, 17-19, 22-24, 31, ECF No. 5. The relationship between Mintz and Marketing Cohorts—specifically, Ashley Nicole Lewis ("Lewis") and Stephanie Lewis, both residents of Oklahoma and the operators of Marketing Cohorts (collectively, "defendants")—rapidly deteriorated. Mintz alleges that her initial agreement provided for a "(i) a customized website with a user[-]friendly store; (ii) graphics and logo; (iii) local search engine optimization hookup; and (iv) a transfer to a new website host." *Id.* ¶ 29. Mintz expected to pay $800 total, $400 of which she paid upfront, with work to be completed within two weeks. *Id.* Nevertheless, after "several months," the work remained incomplete. *Id.* ¶ 35.

      Among many issues that arose, Mintz claims that Lewis "started to complain about working on the TepOrganics website and, in particular, the labels used on the TepOrganics products." *Id.* ¶ 47. Mintz hired a different printer to have new labels made, "enrag[ing]" Lewis, who refused to upload images of the new labels to the website. *Id.* ¶¶ 48-50. Following this dispute,

Mintz claims that she attempted to access the TepOrganics website herself to upload the product images. *Id.* ¶ 56. At that point, she discovered that Lewis had "changed the log-in credentials . . . for the TepOrganics website and social media accounts . . . and did not disclose the new log-in credentials to [Mintz]." *Id.* ¶ 57. More dramatically, Lewis edited the TepOrganics website to display Mintz's name alongside her husband's, with the caption "Assunta Fusco & Kenneth Mintz. Stealing isn't nice. Pay your bill." *Id.* ¶ 68. Similarly, Lewis hijacked the TepOrganics Instagram account and began posting various disparaging remarks directed at Mintz. One post, a photo of Don Vito Corleone from the *Godfather*, was accompanied by the caption: "We don't threaten, we make promises. We get work done and we expect payment. We will be there every time you screw any other person from now until the end of [time]." *Id.* ¶ 66.

Contemporaneously, Mintz received an invoice from Marketing Cohorts, dated July 9, 2018, for $3,820.06. *Id.* ¶ 70. Mintz replied by letter, noting that the invoice was not consistent with the original agreement but nevertheless enclosing a check for $1,074 to satisfy her obligations. *Id.* ¶¶ 73-74. The letter also "demanded that [d]efendants relinquish control of [Mintz's] websites." *Id.* ¶ 74. Marketing Cohorts responded by sending another invoice, this time listing $12,675.49 in outstanding charges. *Id.* ¶ 76. Frustrated by the ever-increasing and, in her view, unjustified invoices, Mintz filed the instant suit, alleging cybersquatting, trade secrets misappropriation, defamation, tortious interference, conversion, and negligence. *Id.* ¶¶ 80-125.

Defendants' *pro se* Answer tells a different story. In sum, the Lewises claim that Mintz made unreasonable demands, caused delays by locking herself out of the accounts, constantly changed the scope of work, and ultimately refused to pay Marketing Cohorts for the extraordinary expenditures of time and labor necessitated by her shifting whims. *See* Answer 2-3, 7, ECF No. 23. Defendants claim that Mintz effectively bankrupted the Lewises, forced them out of their home, and ruined the company. *See id.* at 11; Opp. 3, ECF No. 54. As to the labels, defendants

assert that they did not upload them "because they looked cheap and couldn't be read clearly" and because Mintz kept changing her mind as to how she wanted the labels to appear. Answer 9.

Yet defendants do not deny that they have seized Mintz's websites and social media account. They assert that their actions are justified because Mintz "did not pay for the websites and work," so they are entitled to retain them until payment is made. *Id.* at 10-11. Defendants further claim that Mintz agreed to the additional charges in the subsequent invoices when she requested changes to the scope of work. *Id.* at 11. Nevertheless, defendants offer no evidence that Mintz assented to the specific costs laid out in the later invoices, nor that they notified her that additional requests would lead to increases in price.

After Mintz filed her initial complaint on July 20, 2018, followed by an Amended Complaint on August 2, the Clerk entered default against defendants on September 6, 2018. *Mintz v. Marketing Cohorts, LLC*, 2019 WL 1517109, at *1 (E.D.N.Y. Feb. 21, 2019). Defendants eventually responded to these proceedings by letter dated September 25. ECF No. 14. After several letters were exchanged, Judge Bianco scheduled a telephone conference for November 20. *Mintz*, 2019 WL 1517109, at *1. At the conference, he directed defendants to file an Answer by November 30. *Id.* They failed to do so, belatedly filing an Answer with counterclaims on December 11. *Id.* at *2. After that initial conference, Magistrate Judge Locke scheduled conferences on three separate occasions. Defendants never appeared, either in person or telephonically. *Id.*

In the interim, Mintz filed a motion for a preliminary injunction seeking return of control over her websites and social media account. *Id.* Defendants did not file a response and failed to appear at the hearing—their fourth absence. *Id.* Judge Bianco granted the injunction on February 19, 2019, *id.*, with which defendants still have not complied. On February 21, Magistrate Judge Locke recommended dismissing defendants' counterclaims for failure to prosecute and granting Mintz leave to move to strike the answer and renew her motion for default judgment. *Id.* at *3-5.

3

With no objections filed, Judge Bianco accepted the recommendation. *Mintz v. Marketing Cohorts, LLC*, 2019 WL 1748603, at *1 (E.D.N.Y. Apr. 17, 2019).

Mintz now moves to strike defendants' answer and for entry of default judgment. ECF No. 49. Defendants have asked for a change of venue, Answer 14, and "that the court accept the return of the domains as an end to this case," Opp. 5.

## DISCUSSION

### I. Defendants' Motions to Transfer and Dismiss

In defendants' *pro se* Answer, they requested "a change of venue based upon the contract submitted to this court that [Mintz] can only sue in the state of Oklahoma." Answer 14. While defendants have provided a copy of an invoice with a venue clause on it, *see* ECF No. 56-1, the circumstances do not warrant a transfer to Oklahoma. Forum selection clauses are only enforceable if "the clause was reasonably communicated to the party resisting enforcement." *Phillips v. Audio Active Ltd.*, 494 F.3d 378, 383 (2d Cir. 2007).

Mintz asserts that defendants sent her a different invoice that did not contain a forum-selection provision. 7/7/19 Ltr. 1, ECF No. 57. That invoice, which has the same invoice number as the invoice offered by defendants, *compare* ECF No. 57-2 *with* ECF No. 56-1, matches the design and appearance of other invoices produced in this suit. *Compare* ECF No. 57-2 *with* ECF Nos. 29-5, 29-8. The invoice produced by defendants does not. *See* ECF No. 56-1. Moreover, putting aside visual discrepancies, defendants' purported invoice does not demonstrate that Mintz assented to its terms. Indeed, the comments on the invoice indicate that Mintz paid online *before* seeing defendants' version. *See id.* ("I [Lewis] have voided the online invoice . . . since you [Mintz] can't see the invoice digitally to pay."). This accords with Mintz's sworn statement that defendants did not provide her with this "version of this invoice . . . during the parties' business relationship."

4

Mintz Decl. ¶ 3, ECF No. 57-1. Thus, even if the invoice produced by defendants was genuine, its contents were not "reasonably communicated" to Mintz, so the venue clause is unenforceable.

Defendants have also requested that I "accept the return of the domains as an end to this case." Opp. 5. Putting aside the fact that returning the domains would merely amount to compliance with the preliminary injunction issued months ago, defendants have not actually returned the domains as they claim. *See id.* at 3, 36-39. "Despite repeated efforts by [p]laintiffs' information technology professionals, the domains could not be recovered using the purported mechanism and information provided by the [d]efendants." Reply Br. 4, ECF No. 55. Moreover, defendants have not yet removed any of the disparaging content from the Internet. Defendants' inaction renders dismissal inappropriate.

## II. Sanctions

"All litigants, including *pro se*s, have an obligation to comply with court orders, and failure to comply may result in sanctions." *Agiwal v. Mid Island Mortg. Corp.*, 555 F.3d 298, 302 (2d Cir. 2009) (brackets, citations, and quotation marks omitted). "*Pro se* litigants, though generally entitled to 'special solicitude' before district courts, . . . are not immune to . . . sanction for noncompliance." *Id.* (quoting *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 475 (2d Cir. 2006)). "[T]he court may issue any just orders, including those authorized by Rule 37(b)(2)(A)(ii)-(vii), if a party or its attorney: (A) fails to appear at a scheduling or other pretrial conference; . . . [or] (C) fails to obey a scheduling or other pretrial order." Fed. R. Civ. P. 16(f)(1); *see also* Fed. R. Civ. P. 37(b)(2)(A) (authorizing "striking pleadings" and "rendering a default judgment").

Four factors guide the imposition of sanctions under Rules 16 and 37: "(1) the willfulness of the non-compliant party or the reason for noncompliance; (2) the efficacy of lesser sanctions; (3) the duration of the period of noncompliance, and (4) whether the non-compliant party had been warned of the consequences of noncompliance." *Agiwal*, 555 F.3d at 302 (citation, quotation

marks, and ellipses omitted). "Because the text of the rule requires only that the district court's orders be just, . . . and because the district court has wide discretion in imposing sanctions under Rule 37, these factors are not exclusive." *S. New England Tel. Co. v. Global NAPs Inc.*, 624 F.3d 123, 144 (2d Cir. 2010) (citations and quotation marks omitted). Certain remedies, such as striking a pleading or "entering judgment against a defendant[ ]are severe sanctions, but they may be appropriate in 'extreme situations,' as 'when a court finds willfulness, bad faith, or any fault on the part of the' noncompliant party." *Guggenheim Capital, LLC v. Birnbaum*, 722 F.3d 444, 450-51 (2d Cir. 2013) (quoting *Bobal v. Rensselaer Polytechnic Inst.*, 916 F.2d 759, 764 (2d Cir. 1990).

### A. Striking of Answer and Entry of Default as to the Lewises

Looking first at willfulness, "[h]ere, the defendants are plainly aware of this lawsuit, as indicated by the fact that they answered the complaint." *Castillo v. Zishan, Inc.*, 2017 WL 3242322, at *2 (S.D.N.Y. July 28, 2017). Nevertheless, they failed to comply with the preliminary injunction and "have demonstrated that their non-compliance is willful through their repeated and unexplained failure to appear at scheduled conferences despite having been given notice." *Mintz*, 2019 WL 1517109, at *4. Turning to the duration of the non-compliance, while defendants appeared and filed documents sporadically, nearly six months elapsed between their belated Answer and their response to Mintz's motion to strike and for entry of default judgment. During those six months, defendants missed four appearances, failed to respond to the preliminary injunction motion, and have still failed to comply with the preliminary injunction issued. Non-compliance for "periods of six months or more weigh[s] . . . heavily toward" "dispositive sanctions." *Local Union No. 40 of the Int'l Ass'n of Bridge, Structural & Ornamental Iron Workers v. Car-Win Constr. Inc.*, 88 F. Supp. 3d 250, 266 (S.D.N.Y. Feb. 18, 2015) (collecting cases) (adopting R&R). Finally, "Defendants [were] warned that their continued failure to appear [would]

6

result in a recommendation . . . that their Answer be stricken and[] . . . default be entered with respect to . . . Plaintiffs' claims." 1/17/19 Order.

In sum, defendants' consistent, willful, and dilatory tactics warrant strong sanction. *See City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 129-30 (2d Cir. 2011) (collecting cases upholding entry of default for failure to litigate diligently or comply with court orders). Accordingly, Mintz's motion to strike the answer and enter default judgment is granted.

### B. Entry of Default as to Marketing Cohorts

Corporate entities may not appear *pro se*; they must appear through counsel. *Rowland v. Cal. Men's Colony, Unit II Men's Advisory Council*, 506 U.S. 194, 201-202 (1993) ("It has been the law for the better part of two centuries . . . that a corporation may appear in the federal courts only through licensed counsel."). When a corporation refuses to obtain counsel, entry of default judgment against the entity is appropriate. *Eagle Assocs. v. Bank of Montreal*, 926 F.2d 1305, 1310 (2d Cir. 1991). Defendants contend that they cannot afford counsel. Opp. 5. Putting aside the fact that this contradicts defendants' own representation that they have an attorney in Oklahoma, *see* 10/18/18 Ltr. 2, ECF No. 16, it does not excuse Marketing Cohorts' failure to obtain counsel. Insolvency does not preclude a corporation from "pay[ing] court costs and retain[ing] paid legal counsel." *Rowland*, 506 U.S. at 206. While it may prove impossible to collect a monetary judgment against an insolvent company, judgment may still be entered against it. *See, e.g.*, *Leschak v. Raiseworks, LLC*, 2016 WL 4275432, at *1 (S.D.N.Y. Aug. 10, 2016) (entering default judgment against an insolvent entity). Accordingly, Marketing Cohorts' failure to obtain counsel renders entry of default appropriate.

### III. Consequences of Default

"[A] party's default is deemed to constitute a concession of all well pleaded allegations of liability, [but] it is not considered an admission of damages." *Greyhound Exhibitgroup, Inc. v.*

*E.L.U.L. Realty Corp.*, 973 F.2d 155, 158 (2d Cir. 1992); *see also Finkel v. Romanowicz*, 577 F.3d 79, 83 n.6 (2d Cir. 2009). "However, it is also true that a district court 'need not agree that the alleged facts constitute a valid cause of action.'" *Mickalis Pawn Shop*, 645 F.3d at 137 (quoting *Au Bon Pain Corp. v. Artect, Inc.*, 653 F.2d 61, 65 (2d Cir. 1981). Rather, upon default, "a court is . . . required to determine whether the [plaintiff's] allegations establish[] [defendants'] liability as a matter of law." *Finkel*, 577 F.3d at 84.

   A. Cybersquatting

The Anticybersquatting Consumer Protection Act ("ACPA") "amend[ed] the Trademark Act of 1946, creating a specific federal remedy for cybersquatting." *Sporty's Farm LLC v. Sportman's Mkt., Inc.*, 202 F.3d 489, 496 (2d Cir. 2000). The law, codified at 15 U.S.C. § 1125(d), provides in relevant part:

> A person shall be liable in a civil action by the owner of a mark . . . if, without regard to the goods or services of the parties, that person—
> (i) has a bad faith intent to profit from that mark . . . and
> (ii) registers, traffics in, or uses a domain name that—
>     (I) in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark.

To establish liability, Mintz's allegations must demonstrate that (1) she owns the TepOrganics and Hair on Wheels Now trademarks, (2) the marks were "distinctive at the time of registration of the domain name," (3) defendants "register[ed], traffic[ked] in, or use[d] a domain name that . . . is identical or confusingly similar to the mark[s]," and (4) defendants had "a bad faith intent to profit from [those] mark[s]." 15 U.S.C. § 1125(d)(1). Additionally, defendants may only be held liable if they are "the domain name registrant[s]." *Id.* § 1125(d)(1)(D).

Accepting the Amended Complaint as true, Mintz owns the TepOrganics and Hair on Wheels Now trademarks. Am. Compl. ¶ 81. Defendants have substituted themselves "as the owners of the domains" and registered these domains, thereby qualifying as domain name registrants. *Id.* ¶¶ 85-86. As to whether the marks are "distinctive," "[o]nly suggestive and arbitrary

8

or fanciful marks are inherently distinctive." *Giggle, Inc. v. netFocal, Inc.*, 856 F. Supp. 2d 625, 629 (S.D.N.Y. 2012) (citing *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9-11 (2d Cir. 1976)). Because the name TepOrganics "was coined specifically for purposes of this trademark and has no meaning outside this context," *Pfizer Inc. v. Sachs*, 652 F. Supp. 2d 512, 520 (S.D.N.Y. 2009) (citing *Abercrombie*, 537 F.2d at 11 n.12), it is "fanciful" and qualifies as inherently distinctive. *See id.* Hair on Wheels Now qualifies as a suggestive mark. "A suggestive mark, as might be expected, suggests the product, though it may take imagination to grasp the nature of the product." *Gruner + Jahr USA Publ'g v. Meredith Corp.*, 991 F.2d 1072, 1076 (2d Cir. 1993). Hair on Wheels Now "do[es] not directly describe a quality of the goods sold . . . and several steps of the imagination are needed to conjure the idea of" a traveling salon. *Giggle*, 856 F. Supp. 2d at 630; *see* Am. Compl. ¶ 19. Thus, both the TepOrganics and Hair on Wheels Now marks are distinctive. Furthermore, defendants "use[d] a domain name that . . . is identical . . . to that mark," 15 U.S.C. § 1125(d)(1), as they seized control of the very domain names that were associated with the relevant marks. *See DSPT Int'l, Inc. v. Nahum*, 624 F.3d 1213, 1219 (9th Cir. 2010) (holding that statute applies in such circumstances).

Finally, as to bad faith, Section 1125(d)(1)(B)(i) provides a nonexclusive list of factors to determine whether a person is acting with "bad faith intent to profit" under the ACPA. None of the factors listed in Section 1125(d)(1)(B)(i) weigh in favor of defendants. They had no trademark or intellectual property rights in the domain names. *Id.* § 1125(d)(1)(B)(i)(I). The domain names did not consist of defendants' "legal name[s] . . . or a name that is commonly used to identify" them. *Id.* § 1125(d)(1)(B)(i)(II). They had never previously used the domain name "in connection with the bona fide offering of any goods or services." *Id.* § 1125(d)(1)(B)(i)(III). Nor did defendants engage in "bona fide noncommercial or fair use of the mark[s] in a site accessible under the domain name." *Id.* § 1125(d)(1)(B)(i)(IV).

Perhaps most significantly, defendants "offer[ed] to transfer . . . the domain name[s] to the mark owner . . . for financial gain without having used, or having an intent to use, the domain name[s] in the bona fide offering of any goods or services." *Id.* § 1125(d)(1)(B)(i)(VI). "Factor VI may fairly be read to mean that it is bad faith to hold a domain name for ransom, where the holder uses it to get money from the owner of the trademark rather than to sell goods." *DSPT Int'l*, 624 F.3d at 1221 (footnote omitted). Indeed, holding domains hostage to extract ransoms from lawful mark owners was one of the evils targeted by the ACPA, *see Sporty's Farm*, 202 F.3d at 493, and is precisely what defendants have done and continue to do: They hijacked the TepOrganics website and social media account and used them as digital cudgels to extract payment.

Moreover, defendants' "prior conduct indicat[es] a pattern of such conduct." 15 U.S.C. § 1125(d)(1)(B)(i)(VI). A complaint filed with the World Intellectual Property Organization in August 2018 alleges similar actions by the same defendants. *See* ECF No. 15-1. Specifically, a different company, K-Box, hired Marketing Cohorts to provide certain web-based services. *Id.* at 6-7. After a few months, K-Box decided to discontinue its relationship with Marketing Cohorts as to certain services. *Id.* at 7. Defendants responded by transferring control of the relevant domain to themselves, sending excessive invoices to K-Box, and refused to tender the password or other access information to K-Box, despite K-Box's offer to pay the inflated invoices. *Id.* at 9-10.

Reading defendants' *pro se* answer liberally, they effectively claim that their actions fall within the safe harbor provision, Section 1125(d)(1)(B)(ii) ("Bad faith intent . . . shall not be found in any case in which . . . the person believed and had reasonable grounds to believe that the use of the domain name was a fair use or otherwise lawful."). Specifically, defendants assert that they are merely holding Mintz's websites as collateral based on her failure to pay defendants' belated calculation of the fair value of their services. But neither the parties' contract nor any invoices suggest that the websites may be held as collateral or that ownership of the websites will be

transferred to defendants pending payment. *See* ECF Nos. 29-4, 29-5, 29-8. Even assuming Mintz breached the terms of the contract by failing to pay, "the infringement of a trademark is not a proper self-help remedy for a breach of contract." 4 *McCarthy on Trademarks and Unfair Competition* § 25:31 (5th ed. 2019) (quoting *Green River Bottling Co. v. Green River Corp.*, 997 F.2d 359, 362 (7th Cir. 1993)). If defendants were wronged by Mintz, initiating and diligently prosecuting a lawsuit against her was the proper course of action. Posting childish and derogatory images and text on her Instagram account and website was not. Accordingly, their seizure of the website was not "a fair use or otherwise lawful," 15 U.S.C. § 1125(d)(1)(B)(ii), and Mintz's allegations establish defendants' liability under the ACPA.

### B. Misappropriation of Trade Secrets

"An owner of a trade secret that is misappropriated may bring a civil action." 18 U.S.C. § 1836. To qualify as a trade secret, the owner of the relevant information must "take[] reasonable measures to keep such information secret" and "the information [must] derive[] independent economic value . . . from not being generally known . . . [or] readily ascertainable." *Id.* § 1839(3).

The "log-in credentials," *i.e.* passwords, at issue here do not fit within this definition. As to whether Mintz took "reasonable measures to keep such information secret," the Amended Complaint merely alleges that she "did not disclose the log-in credentials to any third-parties unless such disclosure was necessary to further [her] business objectives," that "the log-in credentials . . . were unique, complex, and . . . unlikely to be duplicated by third-parties," and she "agreed to provide the log-in credentials to [d]efendants for the sole purpose of allowing [them] access to [her] website and social media accounts." Am. Compl. ¶¶ 93, 96-97. Such actions do not, on their own, constitute "reasonable measures." Mintz did not require defendants to sign a non-disclosure agreement nor any sort of covenant to protect the passwords. *Cf. Universal Processing LLC v. Zhuang*, 2018 WL 4684115, at *3 (S.D.N.Y. Sept. 28, 2018) (holding that a "confidentiality

agreement alone does not suggest existence of a trade secret"); *Art & Cook, Inc. v. Haber*, 2017 WL 4443549, at *3 (E.D.N.Y. Oct. 3, 2017) (holding that speaking "to [d]efendant many times about confidentiality, and . . . ask[ing] [d]efendant to sign an employee handbook and non-disclosure agreement . . . though [d]efendant refused to sign" does not qualify as "'reasonable measures' to protect valuable trade secrets"). Nor did Mintz take any other concrete measures to protect the log-in credentials.

Moreover, the passwords do not possess "independent economic value." 18 U.S.C. § 1839(3). The Amended Complaint admits that the log-in credentials only have value to the extent a competitor could use them "to cripple [Mintz's] businesses by . . . removing the websites and preventing [Mintz] from making any online sales or altering the websites in such a way as to drive internet traffic away from the websites." Am. Compl. ¶ 95. "Although the passwords at issue clearly have economic value given that they are integral to accessing [Mintz's] websites, they have no *independent* economic value in the way a formula or customer list might have." *State Analysis, Inc. v. Am. Fin. Servs. Ass'n*, 621 F. Supp. 2d 309, 321 (E.D. Va. 2009) (applying Virginia's similarly worded Trade Secrets Act) (emphasis in original). Put differently, because the economic value of the passwords is not independent of the websites they are used to access, "the passwords are not trade secrets." *Id.* Thus, Mintz's claim for trade secrets misappropriation fails.

C. *Defamation*

To establish defamation, a plaintiff must show: "(1) a written defamatory factual statement concerning the plaintiff; (2) publication to a third party; (3) fault; (4) falsity of the defamatory statement; and (5) special damages or *per se* actionability." *Chau v. Lewis*, 771 F.3d 118, 126-27 (2d Cir. 2014). *First*, under the circumstances here, defendants' statements alleging that Mintz is a thief who stole their work, Am. Compl. ¶¶ 66, 68, "is a direct factual accusation . . . that is likely actionable." *Thomas H. v. Paul B.*, 18 N.Y.3d 580, 585 (2012); *see also Lan Sang v. Ming Hai*,

951 F. Supp. 2d 504, 523 (S.D.N.Y. 2013) (collecting cases holding that "a statement averring that a person is a thief is defamatory in nature"). *Second*, defendants indisputably published these statements by posting them on Instagram and the TepOrganics website. *See generally Firth v. State*, 98 N.Y.2d 365 (2002) (discussing application of defamation rules to statements made on public websites). *Third*, because Mintz is not a public figure, *see Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 324 (1974) (public figures have achieved "general fame or notoriety in the community, and pervasive involvement in the affairs of society"), the relevant standard of fault is negligence, *Stone v. Bloomberg L.P.*, 83 N.Y.S.3d 78, 80 (2d Dep't 2018). Defendants' actions easily clear this hurdle, as they intentionally posted the relevant statements online. *See* Am. Compl. ¶¶ 65-68. *Fourth*, the statements are false. Mintz did not steal Marketing Cohorts work. Rather, she paid defendants for their work, ultimately paying even more than the original agreement required. *See* Am. Compl. ¶¶ 28-32, 70-74. The fact that she did not pay defendants' post-hoc inflated invoices does not render the statements true. *Finally*, Mintz sufficiently alleges defamation *per se* because the relevant statements "tend to injure [Mintz] in . . . her trade, business or profession," *Liberman v. Gelstein*, 80 N.Y.2d 429, 435 (1992), by "imputing to [Mintz] [a] kind of fraud, dishonesty, [and] misconduct" in her business, *Davis v. Ross*, 754 F.2d 80, 82 (2d Cir. 1985) (quoting *Four Star Stage Lighting, Inc. v. Merrick*, 392 N.Y.S.2d 297, 298 (1st Dep't 1977)). Mintz's Amended Complaint establishes each element of defamation.

### D. Other State Law Claims

Mintz "only seek[s] monetary damages in connection with [the] claim of cybersquatting." Opening Br. 17, ECF No. 49-5. Moreover, while she asserts that all her claims warrant injunctive relief, only the cybersquatting, trade secrets misappropriation, and defamation claims relate to the injunctive relief sought. *See id.* 14-17; *see also* ECF No. 49-6 (Proposed Judgment). Accordingly, I decline to consider whether she has established liability as to her other claims. *See Am. Auto.*

13

*Ass'n, Inc. v. Limage*, 2016 WL 4508337, at *2 (E.D.N.Y. Aug. 26, 2016) ("[T]he court need not reach Plaintiff's remaining claims. The scope of appropriate injunctive relief would not vary based on the merits of Plaintiff's remaining federal and state-law claims.").

### E. Relief

#### a. Damages

"In a case involving a violation of section 1125(d)(1) . . . the plaintiff may elect . . . to recover, instead of actual damages and profits, an award of statutory damages in the amount of not less than $1,000 and not more than $100,000 per domain name, as the court considers just." 15 U.S.C. § 1117(d). Mintz seeks the maximum amount authorized by the statute—$100,000 in damages for each of the two domain names at issue, for a total of $200,000.

"Section 1117(d) does not define what is considered 'just.' In determining justness, courts generally rely on the same factors as used in determining justness under Section 1117(c)," *AW Licensing, LLC v. Bao*, 2016 WL 4137453, at *4 (S.D.N.Y. Aug. 2, 2016), which are in turn borrowed from the Copyright Act, 17 U.S.C. § 504(c), *see Tiffany (NJ) LLC v. QI Andrew*, 2015 WL 3701602, at *11 (S.D.N.Y. June 15, 2015). *See also Diesel S.P.A. v. Does*, 2016 WL 96171, at *12 (S.D.N.Y. Jan. 8, 2016) ("[C]ourts have tended to use their wide discretion to compensate plaintiffs, as well as to deter and punish defendants, often borrowing from factors developed in fixing a statutory damage award for copyright infringement." (citation and quotation marks omitted)). These factors include: (1) "the expenses saved and the profits reaped by the infringers;" (2) "revenues lost by the plaintiff;" (3) "the value of the [mark];" (4) "the deterrent effect on others besides the defendant;" (5) "whether the defendant's conduct was innocent or willful;" (6) "whether a defendant has cooperated in providing particular records from which to assess the value of the infringing material;" and (7) "the potential for discouraging the defendant." *Fitzgerald Publ'g Co. v. Baylor Publ'g Co.*, 807 F.2d 1110, 1117 (2d Cir. 1986). The deterrence factors are

most significant. *AW Licensing,* 2016 WL 4137453, at *4. While "[t]he statutory minimum award . . . is presumptively sufficient for purposes of deterrence and compensation," courts regularly depart upwards if "[p]laintiff's allegations . . . establish willfulness." *Mamiya Am. Corp. v. HuaYi Bros., Inc.*, 2011 WL 1322383, at *8 (E.D.N.Y. Mar 11, 2011), *adopted by* 2011 WL 1253748 (E.D.N.Y. Mar. 31, 2011).

Accepting plaintiff's allegations as true, defendants' profit from the infringement was not significant. Even assuming Mintz owed defendants zero dollars, and overpaid by $1,474, any profits barely exceed the statutory minimum. Similarly, while Mintz likely lost some revenue as a result of losing her domain name, the amount is neither specified nor substantiated. Mintz offers no discussion of the value of the mark, her business, or her customer lists. Indeed, the Amended Complaint suggests that she operates a small business, only recently beginning to make sales "to the general public." Am. Compl. ¶ 21. The websites that are the subject of this suit were Mintz's first forays "into the on-line arena," *id.* ¶ 22, so it is unlikely that the domain names garnered substantial traffic or added significant value to Mintz's business.

On the other hand, defendants' conduct was willful. They seized Mintz's social media pages and websites, transforming them into tools of extortion. Given that defendants have repeatedly engaged in such conduct with other parties, the need for deterrence is substantial. One court has concluded that willfully operating a business and website that is confusingly similar to a trademarked brand warranted a ten-fold increase above the statutory minimum. *Mamiya Am.*, 2011 WL 1322383, *1, *8. The action taken by defendants here is even more opprobrious, as they took control of Mintz's actual website and altered its contents.

But the need for such deterrence is tempered by defendants' purported financial travails, s*ee* Answer at 3-6, 11. *Cf. Zazu Designs v. L'Oreal S.A.*, 979 F.2d 499, 508 (7th Cir. 1992) ("Courts take account of a defendant's wealth when an amount sufficient to deter one individual may be

trivial to another." (quotation marks and citations omitted)). Marginal deterrence diminishes with each added dollar of damages, and it decreases to zero if defendants cannot pay the entire award. Thus, damages of $2,500 per domain—for a total of $5,000—are just under these circumstances.

   b. Injunctive Relief

"In any civil action involving the registration, trafficking, or use of a domain name . . . , a court may order the forfeiture or cancellation of the domain name or the transfer of the domain name to the owner of the mark." 15 U.S.C. § 1125(d)(1)(C). In general, transfer of a domain name pursuant to Section 1125(d)(1)(C) is appropriate where a defendant has violated the ACPA, and especially where the defendant expresses an intent to continue using the infringing domain name. *See Northwell Health, Inc. v. Northwell Staffing Agency, LLC*, 2018 WL 1525803, at *11 (E.D.N.Y. Mar. 1, 2018) (citing *Prime Publ'rs., Inc. v. Am.-Republican, Inc.*, 160 F. Supp. 2d 266, 282 (D. Conn. 2001)), *adopted by* 2018 WL 1525698 (Mar. 28, 2018). I have already found that defendants violated the ACPA and, given their failure to comply with the preliminary injunction, it is likely that they will continue to use the infringing domain names. Accordingly, defendants must cease using the domain names and transfer them to Mintz. Mintz's request that I order the relevant entities to transfer control of the domain names and Instagram account is denied, as such relief is only available in *in rem* proceedings under 15 U.S.C. § 1125(d)(2), and I have no jurisdiction over the relevant entities.

As to Mintz's request for injunctive relief based on her defamation claim, "for almost a century the Second Circuit has subscribed to the majority view that, absent extraordinary circumstances, injunctions should not ordinarily issue in defamation cases." *Metro. Opera Ass'n, Inc. v. Local 100, Hotel Emps. & Restaurant Emps. Int'l Union*, 239 F.3d 172, 177 (2d Cir. 2001). Mintz offers no reason to depart from the ordinary rule here. Indeed, the defamatory statements will likely be taken down shortly after control of the domain is returned to Mintz.

Mintz also seeks the return of the log-in credentials and that defendants stop posting content. As to the former request, Mintz has not established a misappropriation of trade secrets to support her request that the passwords be returned. As to the latter, once the domain names and social media account are transferred back to Mintz, defendants will be unable to post content on those websites. An injunction to that effect is unwarranted.

## CONCLUSION

Defendants' motions to transfer and dismiss are denied. Their answer is stricken, and default judgment shall be entered against defendants as to Mintz's cybersquatting and defamation claims. Mintz is awarded $5,000 in damages on her cybersquatting claim. Defendants are ordered to transfer the teporganics.com and haironwheelsnow.com domain names and the TepOrganicsTuttoepossible Instagram account to Mintz.

**SO ORDERED.**

Brooklyn, New York  *Edward R. Korman*
July 25, 2019  Edward R. Korman
United States District Judge